IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     vs.<br><br>LACEE DAWN TUTTLE,<br><br>          Defendant. | **8:20CR141**<br><br>**FINDINGS AND**<br>**RECOMMENDATION** |

This matter is before the Court on the Motion to Suppress and Exclude Evidence (Filing No. 41) filed by Defendant, Lacee Dawn Tuttle. Defendant filed a brief (Filing No. 42) in support of the motion and the government filed a brief (Filing No. 46)[1] in opposition. In advance of an evidentiary hearing, the Court held two telephone conferences with counsel on October 19 and December 4, 2020, to clarify the issues raised by the motion. (Filing Nos. 49-50, 57).

The Court held evidentiary hearings on the motion on December 10, 2020, and January 20, 2021. The transcript of the first hearing (TR1) was filed on December 17, 2020. (Filing No. 63). The transcript of the second hearing (TR2) was filed on January 30, 2021. (Filing No. 72). Defendant was present with her attorney, Joshua W. Weir, at both hearings. The government was represented by Assistant United States Attorney, Jody Mullis. Santee Sioux Police Department officers Marlin Mousseau, William Blevins, and Chief Robert Henry, and Drug Enforcement Agency Special Agent Tina Cleveland ("SA Cleveland"), a task force officer with the Nebraska State Patrol, testified on behalf of the government. The Court received into evidence Exhibits 1-18 offered by the government without objection and Exhibits 101 and 102 offered by Defendant without objection. (TR2 at 7). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be granted, in part, and in part denied.

## BACKGROUND

In the early morning hours of July 14, 2019, Santee Sioux Police Officer Blevins was working a shift within the boundaries of the Santee Sioux Reservation when he decided to stop and check in with security at the Ohiya Casino Resort. A casino security officer, Sirus Kitto,

---

[1] The government also filed a Notice of *Errata* regarding information provided in its brief. (Filing No. 47).

approached Officer Blevins and reported that a front desk employee had found two small clear baggies[2] on the casino floor containing what looked like methamphetamine. Officer Blevins placed the baggies in an evidence bag and secured it in a vault in his police vehicle, and asked casino surveillance to review security footage to identify the individual that dropped the baggies. While Officer Blevins was waiting for casino surveillance to complete their security footage review, he received an unrelated medical emergency call. Officer Blevins left the casino to respond to the emergency call where he met Santee Sioux Police Officer Mousseau. After completing the emergency call, the two officers headed back to the Ohiya Casino to begin an investigation into the source of the baggies. (TR1 at 120-125; Ex. 1).

Officer Blevins showed Officer Mousseau the baggies recovered from the casino floor; both officers testified that in their training and experience, the crystal-like substance appeared to be methamphetamine.[3] (TR1 at 13-16, 124-125, 138-139). Officer Blevins testified the baggie he recovered was about the size of a dime bag, and was "[o]ne of the real small ones that you would usually find methamphetamine or cocaine in," estimating its measurements to be about three-quarters of an inch wide by about three-quarters of an inch tall. Officer Blevins testified a dime bag is generally known as a user amount. (TR1 at 136). Officer Mousseau testified he could not estimate how much methamphetamine was contained within the baggies found on the casino floor but compared to the "really small" amount that he "usually" deals with, it appeared to him to be "a lot" of methamphetamine. (TR1 at 72-73). Officers did not field test the substance to confirm their suspicions. (TR1 at 138).

Officer Mousseau's body worn camera (TR1 at 22, 43; Ex. 2; Ex. 3) and Officer Blevins' body worn camera (TR1 at 129; Ex. 4) captured the events of the evening once they arrived at the casino. Officer Mousseau met with a security surveillance officer for the casino, William Payer, who provided the physical description of the woman he saw drop the baggies on the casino surveillance footage, as well as descriptions of the woman and man that had arrived with that individual in the same car. Payer pointed out to Officer Mousseau the car in the casino parking

---

[2] Officer Blevins testified he handled only one baggie from the casino floor, but the police reports, body camera footage, security footage and Officer Mousseau's testimony indicate that two baggies were found on the casino floor. (TR1 at 13-16, 136; Ex. 1; Ex. 11; Ex. 4 at 10:31; Ex. 6).

[3] Officer Blevins has been a police officer with the Santee Sioux Police since April 2016 and received training on how identify controlled substances, including methamphetamine, at police academy. (TR1 at 119, 138). Officer Mousseau has been a police officer for twenty-one years, has worked for the Santee Sioux Police for over five years, and has extensive experience and training on recognition of controlled substances. (TR1 at 12, 16, 72). Defendant introduced Exhibits 101 and 102 to discredit Officer Mousseau's testimony in this matter. (TR2 at 7).

lot in which the three individuals had arrived. These individuals were later identified as Defendant, Defendant's mother, and Defendant's boyfriend.  Payer stated that two baggies fell out of the right pocket of a "big" white female wearing a white shirt and blue jean capris after she reached into her pocket.  Payer stated the woman was playing a machine in the back of the casino near an exit door and next to the cage.  (TR1 at 17-18, 62, 137-138; Ex. 2 at 1:00-2:41).[4]

Officer Mousseau entered the casino and immediately approached Defendant, who was playing at a machine on the casino floor, and directed her to cash out and follow him to a larger empty room with Officer Blevins and casino security officer Kitto.  (TR1 at 19-20, 126; Ex. 2 at 3:43).   Shortly after Officer Mousseau escorted Defendant to this room, Defendant's mother entered the room; Officer Mousseau stated, "You want to be a part of this too?" and the other officers directed Defendant's mother to stand outside.  (TR1 73-74; Ex. 2 at 5:06).  Officer Mousseau began explaining to Defendant what was captured on the casino surveillance camera and stated he was going to have her empty her pockets.  Defendant began emptying the contents of her left pocket.  Officer Mousseau then pointed at Defendant's right pocket, at which point Defendant retrieved something from that pocket and threw it into a trash can in front of her.  (Ex. 2 at 5:23; Ex. 4 at 1:10-1:30; Ex. 7 at 00:37; TR1 at 127).  Officer Mousseau testified he heard the objects hit the bottom of the trash can because the trash can was empty.  Officer Mousseau immediately "grabbed" Defendant, handcuffed her, and told her she was under arrest.  (TR1 at 20-22; Ex. 2 at 5:25; Ex. 4 at 1:33).  Officer Mousseau retrieved the objects from the trash can, which were two pipes.  (TR1 at 20-22; Ex. 2 at 7:23).  The contents of Defendant's pockets were emptied and placed on a table in front of her, including her wallet, phone, and some cash.  After searching Defendant's wallet, Officer Mousseau examined Defendant's driver's license and asked her if she was "enrolled" in a Native American tribe; Defendant replied she was not.  (TR1 at 23; Ex. 2 at 8:05).  Officer Mousseau explained she would be facing state charges for which she may be able to post bond. Defendant asked questions about how much bond would be and mentioned having more money.  (TR1 at 24-25; Ex. 2 at 10:17).  Defendant was not carrying a bag or purse with her inside the casino.

Officer Blevins escorted Defendant outside to Officer Mousseau's police vehicle, which was parked directly in front of the casino entrance, and placed her handcuffed in the back seat.  (Ex. 4 at 8:20; Ex. 2 at 11:39; TR1 at 127).  By this time, Defendant's boyfriend and mother had

---

[4] The casino security footage reviewed by Payer was offered into evidence.  Ex. 6.

exited the casino and asked Officer Mousseau what was happening. (TR1 at 25-26; Ex. 3 at 00:45). Officer Mousseau replied, "She's going to jail." (Ex. 3 at 00:48). Defendant's mother asked Officer Mousseau, "Where at?" and after Officer Mousseau replied, Defendant's mother asked Defendant's boyfriend, "We have her keys?" Defendant's boyfriend replied, "Yeah I got them." (Ex. 3 at 00:54).

Officer Mousseau next returned to his police vehicle where Defendant had been placed. Defendant asked Officer Mousseau, "Can you tell my mom there's more money in my purse to bond me out?" (Ex. 3 at 1:46). Officer Mousseau testified he "inferred" that this was Defendant asking him to get the money out of her purse for her. (TR1 at 26). Officer Mousseau then approached Defendant's mother and boyfriend. (TR1 at 25-26; Ex. 3 at 2:40). Officer Mousseau asked to see Defendant's mother's identification. (Ex. 3 at 2:45). After writing down Defendant's mother's information, Officer Mousseau stated, "I don't need to search you but I do need to search her [Defendant's] purse. She said there's more money in her purse. I hope there's no more drugs in there." (Ex. 3 at 3:50).

Officer Mousseau next took Defendant's boyfriend's driver's license and asked if he or Defendant's mother had anything in their pockets. Both emptied their pockets and stated they had nothing, and Defendant's mother let Officer Mousseau look through a small bag she was carrying. (Ex. 3 at 5:20). Defendant's mother advised Officer Mousseau that Defendant was the registered owner of the car. (Ex. 3 at 6:11). Officer Mousseau replied, "Who's got the keys?" Defendant's boyfriend replied, "I do." Officer Mousseau gestured with his hand for Defendant's boyfriend to turn over the keys and he complied. (Ex. 3 at 6:16-18; Ex. 4 at 14:25). Officer Mousseau stated, "We're going to make sure there's nothing else in there." (Ex. 3 at 6:29). Although Defendant's boyfriend had seemingly emptied his pockets, officers then searched him and found nothing on his person. (Ex. 3 at 6:55). Officer Mousseau testified that Defendant's mother and boyfriend did not appear under the influence of any substances, there was no indication they could not operate a motor vehicle, and he had no reason to arrest or detain them. (TR1 at 80).

Officer Mousseau headed to the casino parking lot to find Defendant's car, initially approaching the wrong car. (Ex. 3 at 8:20). One of the casino security officers directed Officer Mousseau to the correct car and stated, "[B]efore she came in she stuck a bag in the trunk." (Ex. 3 at 9:20). Officer Mousseau testified his "sole purpose of going to [Defendant's] car and obtaining the money out of the purse was based on [Defendant's] request." (TR1 at 32). Officer

Mousseau also agreed that at the time he first headed to Defendant's car, he did not have "any reason to believe that there were any items of evidentiary value in that car[.]" (TR1 at 75-76). However, Officer Mousseau also testified he believed there could be "some type of ledger or anything associated with selling methamphetamine . . . present in the vehicle." (TR1 at 30-32). Officer Mousseau testified he intended to give Defendant her purse but needed to search it first in case it contained weapons or other contraband. (TR1 at 27-29).

After reaching the correct car, Officer Mousseau first opened the driver's side door and visually inspected the driver's side interior before activating the trunk latch. Officer Mousseau approached the open trunk and took out Defendant's purse and searched it. (Ex. 3 at 9:40). Inside Defendant's purse, Officer Mousseau found what appeared to be methamphetamine, cash, pill bottles with no prescription label, and drug paraphernalia. (TR1 at 27-29; 101-102; Ex. 3 at 10:16). After continuing his search of Defendant's purse and the car's trunk for a few minutes, Officer radioed dispatch to send a "wrecker" to his location. (Ex. 3 at 14:30). Officer Mousseau continued the search for several minutes before returning to his police vehicle to advise Defendant of her rights under *Miranda*. (Ex. 3 at 23:35).

Officer Mousseau testified that "[b]ased on what we found up to that point," he decided to do an inventory search of the car because he planned on towing and impounding the vehicle from the casino parking lot. (TR1 at 33, 95-96). Officer Mousseau testified that before he found the contraband inside Defendant's purse, he had no reason to impound Defendant's vehicle. (TR1 at 84). Officer Mousseau testified Defendant's car would have been towed "regardless because of the incident that had occurred" as the casino has a "zero tolerance policy for drugs . . . If [an individual] can't remove [his or her] vehicle because [he or she is] arrested, then it's towed and impounded." (TR1 at 34). Officer Mousseau clarified that "towing" and "impounding" a vehicle are the same thing. (TR1 at 95).

Officer Mousseau asked Officer Blevins to search the front seat of Defendant's vehicle. (TR1 at 128). Officer Blevins testified he filled out an inventory sheet after it was decided the vehicle would be towed. The officers do not know what happened to the inventory sheet and no copy was provided to Defendant or the court. (TR1 at 128-134; Ex. 4 at 30:24). Officer Mousseau testified he did not think a copy of the inventory sheet was required to be provided to the owner of the vehicle. (TR1 at 37).

Officer Blevins testified that he was not aware of the Santee Tribal Police's written policy for inventorying vehicles besides the training he received at the United States Indian Police Academy. (TR1 at 134). Officer Mousseau also testified he was not aware of any written inventory search or impound policy of the Santee Tribal Police nor has he received training on any policy. Officer Mousseau testified he was told when he first started working for the Santee Tribal Police that when towing or impounding a vehicle, he should "fill out [an impound] form and then . . . leave it in the front office [of the police department.]" (TR1 at 36-37, 80-81).

Santee Tribal Police Chief Robert Henry testified that the department did in fact have a written policy in place on July 14, 2019, for inventorying vehicles, although it has since come to his attention that not all officers were aware of the policy. (TR1 at 115-116; Ex. 13). The policy in effect on July 14, 2019, provided:

> A. On any arrests involving vehicles, the officer will use the following criteria to determine whether or not to impound the vehicle:
>
> > 1) Location
> > 2) Time of Day
> > 3) Area
>
> B. If the Officer feels the vehicle will not be safe at its present location it will be impounded.
>
> C. All vehicles impounded will be towed to the nearest available storage facility. Upon reaching the storage facility, a complete inventory will be made of the contents of the car. . . . A copy of the inventory list will be left with the owner of [sic] operator of the vehicle and a copy will be placed in the arrest report.

(Ex. 13).

A private towing company towed Defendant's vehicle to a garage thirteen miles away from the casino. (TR1 at 35, 37). Officer Mousseau does not know what happened to the car after it was towed to the garage. (TR1 at 96).

Because Defendant was not a Native American enrolled in a tribe, Officer Mousseau contacted the Knox County Sheriff's department for assistance. (TR1 at 38-40; TR1 at 133; Ex. 3 at 17:50). Officer Bryan Ruhr, who works part-time for Knox County Sheriff, arrived at the casino approximately fifty minutes after Defendant was handcuffed. After being advised of the situation, Officer Ruhr stated he would follow Officer Mousseau as he transported Defendant to

the Knox County jail for booking. (TR1 at 39-41; Ex. 5 at 2:17). Defendant was not charged tribally. (TR1 at 42).

Defendant was initially charged in this case with a criminal complaint filed on May 14, 2020. (Filing No. 1). On May 21, 2020, Defendant was arrested pursuant to an arrest warrant issued by the undersigned magistrate judge in connection with the criminal complaint. On May 26, 2020, the undersigned magistrate judge signed a search warrant for Defendant's cell phone seized from her person when she was arrested on May 21, 2020. (Ex. 15). The application supporting the search warrant contains the July 14, 2019, events described above, but also describes a separate incident that took place on October 22, 2019. As described by the warrant application, on October 22, 2019, Nebraska Police Officers encountered Defendant in a pickup truck with two men in Norfolk, Nebraska. Defendant had an active arrest warrant for theft. Defendant dropped a clear baggie with a white crystal substance appearing to be methamphetamine (and later field tested positive for methamphetamine). A glass pipe containing white residue was also seized from her person. Additional methamphetamine and items indicative of drug distribution were found in her purse and a zippered wallet. Defendant is now charged in an Indictment (Filing No. 21) with two counts of possession with intent to distribute methamphetamine, and two counts of evidence tampering, arising out of the July 19, 2019, and October 22, 2019, incidents.

Defendant filed the instant motion to suppress any and all evidence recovered from her person, the trash can, her purse, and her vehicle; any statements she made after her arrest on July 19, 2019; and any electronic evidence obtained from the search of her phone pursuant to the warrant dated May 26, 2020, as violative of the Fourth and Fifth Amendments. (Filing No. 42). Defendant also contends any evidence and statements obtained on July 19, 2019, should be suppressed as the Santee Police Department officers, as tribal officers, did not have jurisdiction to arrest her, search her purse or car, or question her because she is not a Native American. (TR1 at 8; Filing No. 42 at 12-13).

The parties have stipulated to the following facts: Officer Marlin Mousseau is a tribal officer with the Santee Police; Officer William Blevins is a tribal officer with the Santee Police; Defendant is not a Native American; the Ohiya Casino and its parking lot are contained within the exterior boundaries of the Santee Sioux Reservation in Nebraska; and Officer Bryan Ruhr is not a tribal officer. (TR1 at 9-10). As to the search warrant obtained for Defendant's cell phone,

Defendant concedes that probable cause supports the warrant even if the information in the warrant application Defendant asserts was unlawfully obtained was excised.  (TR1 at 5-7). Additionally, although Defendant initially raised arguments seeking to suppress statements she made on the night of July 14, 2019, following the second evidentiary hearing and after adducing additional evidence, Defendant withdrew her motion to suppress with respect to any statements she made that day.  (TR2 at 37-38).

Remaining before the Court are the following issues. Defendant first argues Officer Mousseau's initial contact with Defendant was not a consensual encounter[5] and he lacked reasonable suspicion to initially stop her and escort her off the gaming floor.  Defendant argues that, because she disposed of the two pipes during that unlawful seizure, such evidence should be suppressed.  (Filing No. 42 at pp. 5-6).  Defendant next argues that even if Officer Mousseau had reasonable suspicion she committed a crime, his authority was limited to determining whether she was Indian; once he determined she was not Indian, Officer Mousseau did not have jurisdiction to search for evidence of other crimes and only had authority to detain Defendant for delivery to state or federal authorities.[6]  (Filing No. 42 at p. 14).  Defendant next argues that any evidence obtained from the warrantless search of her purse and vehicle must be suppressed as those searches were made without probable cause or her consent.  Defendant maintains that the inventory search exception does not apply because no caretaking or public safety reasons were present to impound her vehicle and officers had unfettered discretion as to when to impound a vehicle.  (Filing No. 42 at p. 12; TR1 at 163).

The government argues that reasonable suspicion existed to initially detain Defendant and probable cause existed to arrest her after she attempted to throw away two pipes in officers' presence.  (Filing No. 46 at p. 1). The government contends the warrantless search of Defendant's purse and car were valid pursuant to the automobile exception, search incident to arrest exception, and/or inventory search exception. (TR1 at 6; Filing No. 46 at p. 2). Finally, the government contends that tribal officers have the authority to temporarily detain non-Indians and investigate violations of law committed by non-Indians on reservation land.  (Filing No. 46 at p. 2).

---

[5] The government does not contend this was a consensual encounter. (Filing No. 46 at p. 11).

[6] Defendant does not raise a tribal jurisdiction argument regarding her initial detention.  (TR1 at 6).

# ANALYSIS

## I.     Initial Detention

Defendant first argues Officer Mousseau lacked reasonable suspicion to stop her and escort her off the gaming floor pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).  Specifically, Defendant argues that Officer Mousseau had no reason to believe the plastic baggies found on the casino floor belonged to Defendant or that the baggies contained an illegal substance. The undersigned magistrate judge disagrees.

An officer may stop an individual if the officer has reasonable and articulable suspicion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30.  In order to justify a stop, a law enforcement officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. Whether reasonable suspicion exists is based on "the totality of the circumstances, in light of the officer's experience." *United States v. Stigler*, 574 F.3d 1008, 1010 (8th Cir. 2009). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence" as well as "a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect." *United States v. Quinn*, 812 F.3d 694, 697-98 (8th Cir. 2016)(quoting *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995); citing *United States v. Juvenile TK*, 134 F.3d 899, 903-04 (8th Cir. 1998)).

The undersigned magistrate judge finds that officers had reasonable suspicion justifying Defendant's initial detention.  Officer Blevins was approached by casino security because two suspicious looking baggies were found by a casino employee on the floor. The undersigned magistrate judge finds Officer Blevins' testimony is credible regarding his belief that the white crystalline substance was methamphetamine.  Although the officers did not field test the substance, laboratory testing later confirmed it was methamphetamine.  (TR1 at 110-111; Ex. 10). At Officer Blevins' direction, casino security reviewed its surveillance footage to identify the person responsible for dropping the baggies.  While neither Officer Mousseau nor Officer Blevins personally reviewed the surveillance footage before contacting Defendant, casino security officer Payer, a former police officer for the Santee Sioux Police department, reviewed the surveillance footage and provided a detailed description to Officer Mousseau.  (TR1 at 17).  Payer described

Defendant and what she was wearing, told the officers where she was inside the casino, and described seeing the baggies fall on the floor when she reached into her pocket. The casino surveillance footage reviewed by Payer is clear, bright, and unmistakably shows two white baggies fall on the floor as Defendant walks by with her boyfriend. See Ex. 6. Officer Mousseau had no trouble locating Defendant inside the casino based upon Payer's description. Considering the totality of the circumstances, the undersigned magistrate judge finds officers had reasonable suspicion to initially stop and detain Defendant to investigate.

## II.    Tribal Jurisdiction

Defendant next contends that, even if Officer Mousseau had reasonable suspicion Defendant committed a crime, his authority was limited to determining whether she was Indian, and once he determined she was not, he only had authority to detain Defendant for delivery to state or federal authorities. Accordingly, Defendant argues that evidence obtained from the search of her purse and vehicle must be suppressed because tribal officers did not have jurisdiction. (Filing No. 42 at p. 14).

Non-Indians generally are not subject to the criminal jurisdiction in tribal courts. See *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 195 (1978). "But tribal police officers do not lack authority to detain non-Indians whose conduct disturbs the public order on their reservation." *United States v. Terry*, 400 F.3d 575, 579 (8th Cir. 2005). "Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities." *Id.* (quoting *Duro v. Reina*, 495 U.S. 676, 697 (1990)). "Because the power of tribal authorities to exclude non-Indian law violators from the reservation would be meaningless if tribal police were not empowered to investigate such violations, tribal police must have such power." *Id.* at 579-80. "When exercising this power, however, tribal officers must avoid effecting a constitutionally unreasonable search or seizure." *Id.* at 580 (citing 25 U.S.C. § 1302(2)). In other words, a tribal officer's search and seizure of a non-Indian must still be reasonable under Fourth Amendment standards. See 25 U.S.C. § 1302(2); *Terry*, 400 F.3d at 580 (concluding tribal officers had authority to seize a non-Indian and search his vehicle and that tribal officers complied with the Fourth Amendment in conducting the search).

Defendant cites to a Ninth Circuit case, *Bressi v. Ford*, 575 F.3d 891, 896 (9th Cir. 2009), for the proposition that a tribe has "no authority to prosecute or investigate" non-Indian offenders and instead may only detain a non-Indian offender for delivery to state or federal authorities. (Filing No. 42 at p. 13). As recognized by the government, *Bressi* was decided in the context of a suspicionless stop of a non-Indian on public right of way that crossed over tribal land. Similarly, the Ninth Circuit in *United States v. Cooley*, 919 F.3d 1135, 1148 (9th Cir. 2019), *cert. granted*, No. 19-1414, 2020 WL 6811249 (U.S. Nov. 20, 2020) concluded a tribal officer exceeded his jurisdictional authority by searching a vehicle after the officer determined the driver was non-Indian. Again, the Ninth Circuit made this determination after recognizing "tribes have less power over non-Indians on public rights-of-way that cross over tribal land . . . than on non-encumbered tribal property." *Id.* The Supreme Court granted certiorari in *Cooley* to determine whether the tribal officer "lacked authority to temporarily detain and search respondent, a non-Indian, *on a public right-of-way* within a reservation based on a potential violation of state or federal law." In this case, Defendant was stopped by tribal officers not on a public right away, but instead inside of a casino within the exterior boundaries of the reservation. Tribal officers do not lack authority to investigate and detain non-Indians "whose conduct disturbs the public order on their reservation." *Terry*, 400 F.3d at 579. Therefore, the question pending before the Supreme Court in *Cooley* will not be determinative in this case.

Here, the record does not indicate tribal officers ever intended to require Defendant to submit to the criminal jurisdiction of the tribe. Once Defendant stated she was not enrolled in a tribe, Officer Mousseau stated she would be charged in state court and may be able to post a bond. Officers contacted the Knox County Sheriff's department for assistance, and Officer Ruhr, a non-tribal officer, arrived at the casino approximately forty minutes after Defendant was first handcuffed. Officer Mousseau advised Officer Ruhr of what had transpired, and transported Defendant to a county detention center at Officer Ruhr's direction. Defendant was not charged tribally and Officer Mousseau prepared an arrest/probable cause affidavit for state charges. (Ex. 11). Under the circumstances, the undersigned magistrate judge finds that tribal officers did not exceed their investigative authority to determine whether to eject Defendant from the reservation. See *Terry*, 400 F.3d at 580. As such, the undersigned magistrate judge recommends denial of Defendant's motion to suppress to the extent it seeks suppression of evidence due to the tribal officers' lack of jurisdiction over her as a non-Indian. However, as stated above, a tribal officer's

search and seizure of a non-Indian must still be reasonable under Fourth Amendment standards, which the undersigned magistrate judge will next consider.  See 25 U.S.C. § 1302(2).

### III.    Arrest

Defendant argues she was unlawfully arrested at the time she was asked by law enforcement to empty her pockets, and therefore, the evidence she discarded in the trash can must be suppressed.  (TR1 at 160).  The undersigned magistrate judge finds that Defendant was lawfully detained by officers at the time she discarded the pipes in the trash can and Officer Mousseau had probable cause to arrest her after he witnessed her do so.

As discussed above, officers had reasonable suspicion to conduct an investigatory stop of Defendant.  "During an investigative stop, officers should 'employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose' of the temporary seizure." *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005)(quoting *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir.1999).  "The means used to effect the seizure must be objectively reasonable in light of the facts and circumstances confronting the officers."  *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).  Here, the undersigned magistrate judge finds officers did not exceed the scope of the permissible investigatory stop when they escorted Defendant to a larger empty room off of the casino floor and asked her to empty her pockets.  See, e.g., *United States v. Montano-Gudino*, 309 F.3d 501, 504 (8th Cir. 2002)(finding law enforcement did not exceed the permissible scope of an investigatory stop when they escorted the defendant to a room with three armed officers and where the defendant "voluntarily emptied his pockets in response to the officers' request"). Defendant discarded two pipes into an empty trash can in officers' immediate view during this brief and lawful detention, at which point probable cause clearly existed for her warrantless arrest. See *Virginia v. Moore*, 553 U.S. 164, 176 (2008)("[W]arrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution[.]").  Additionally, it is well established that there is no reasonable expectation of privacy in inculpatory items discarded "in trash left for collection in an area accessible to the public."  *California v. Greenwood*, 486 U.S. 35, 41 (1988).  Defendant threw the two pipes into one of the casino's trash cans, thereby relinquishing any reasonable expectation of privacy in those items. Because officers' actions

inside the casino were reasonable under the Fourth Amendment, any evidence obtained by officers inside the casino should not be suppressed.

### IV.    Warrantless Searches

Defendant next argues that the warrantless search of her vehicle and purse, which was contained within her vehicle in the casino parking lot, violated the Fourth Amendment.  The government contends that the warrantless search of Defendant's purse and vehicle were permissible pursuant to the search incident to arrest exception, automobile exception, and/or the inventory search exception.  (TR1 at 6; Filing No. 46 at p. 2).  After thorough review of the record, and in assessing the credibility of the witnesses, the undersigned magistrate judge finds that the government has not met its burden to establish an exception to the warrant requirement applies to the facts of this case, and therefore, any evidence obtained from the warrantless searches of Defendant's purse and vehicle should be suppressed as fruit of a Fourth Amendment violation.

In every case addressing the reasonableness of a warrantless search, the court's analysis should begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009)(quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "The government bears the burden of establishing that an exception to the warrant requirement applies."  *United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004).  Therefore, the warrantless searches of Defendant's purse and car are *per se* unreasonable under the Fourth Amendment unless the government has established that an exceptions applies.

### A. Search Incident to Arrest

One of the exceptions to the warrant requirement is a search incident to a lawful arrest. See *Gant*, 556 U.S. at 338.  "The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations."  *Id.* (citing *United States v. Robinson*, 414 U.S. 218, 230-234 (1973); *Chimel v. California*, 395 U.S. 752, 763 (1969)).  This exception justifies a warrantless search "of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain

possession of a weapon or destructible evidence." *Ibid.* "That limitation, which continues to define the boundaries of the exception, ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Ibid.* See also, *Basham v. United States*, 811 F.3d 1026, 1028 (8th Cir. 2016)("[I]n a search incident to arrest, police officers are allowed to search not only an arrestee's person for weapons, but also for evidence, and the scope of the search *extends to containers found on the person*.")(emphasis added).

The government cites *Curd v. City Court of Judsonia, Arkansas*, 141 F.3d 839, 842 (8th Cir. 1998) to support its position that the search of Defendant's purse was a valid search incident to arrest. (Filing No. 46 at p. 15). Specifically, the government argues that a purse is an article "immediately associated" with a person, and a search of such articles "may be made either at the time of arrest or when the accused arrives at the place of detention." See *Curd*, 141 F.3d at 843 (citation omitted). However, officers in *Curd* took the defendant's purse from her person when she was arrested and later removed it from her sight at the detention center. The court in *Curd* found that even though the defendant could not reach the purse at the time of the later search, the search was nevertheless a constitutional search incident to arrest because her purse was an object within her area of "immediate control" when she was arrested. See *id.* at 842.

Unlike *Curd*, Defendant did not have her purse on her person at the time she was arrested, nor at any point when she was inside the casino. Instead, Defendant placed her purse in the trunk of her locked car in the casino parking lot before setting foot inside the casino. Defendant did not even have the keys to the car—she entrusted those to her boyfriend. As such, Defendant's purse was not a container on her person, or anywhere near her person, at the time she was arrested. Moreover, during the search of Defendant's person inside the casino, officers obtained her wallet, cash, and cell phone, among other personal effects that would ordinarily be kept inside a purse. So, although a purse typically is an item "immediately associated" with a person, that was not the case here. "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Gant*, 556 U.S. at 339.

The government further argues that because Defendant "asked for her purse" following her arrest, Officer Mousseau had authority to search its contents. (Filing No. 46 at p. 15). However, the record does not establish that Defendant ever asked law enforcement for her purse.

Instead, Defendant said to Officer Mousseau, "Can you tell my mom there's more money in my purse to bond me out?" (Ex. 3 at 1:46). While Officer Mousseau testified he "inferred" that this was Defendant asking him to get the money out of her purse for her, that was very clearly not Defendant's request. The record simply does not support any contention that Defendant asked for her purse. To the extent the government argues Defendant's mother should not have been able to access the purse for officer safety, Officer Mousseau had already searched Defendant's mother and testified he had no reason to arrest or detain her. (TR1 at 80).

Because Defendant's purse was not a container found on her person when she was arrested and was not "immediately associated" with her or within her "immediate control," the undersigned magistrate judge finds that the government has not meet its burden to establish that either justification for a search incident to arrest applies.

### B. Automobile Exception

The government also argues the warrantless search of Defendant's purse and car were justified under the automobile exception. "Under the automobile exception, officers may search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Davis*, 569 F.3d 813, 817 (8th Cir. 2009)(citing *United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005)(citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "In determining whether an officer had probable cause to search, courts apply a common sense approach and consider all relevant circumstances." *Id.* (citing *United States v. Gleich*, 397 F.3d 608, 613 (8th Cir. 2005)). If probable cause justifies the search of a vehicle, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012)(quoting *United States v. Ross*, 456 U.S. 798, 800 (1982)).

The government contends probable cause existed to search Defendant's car because casino surveillance footage indicated she dropped two baggies of suspected methamphetamine on the casino floor and because she attempted to throw away two pipes from her pants pocket when she was detained by law enforcement. Since Defendant's purse was inside her car's trunk, the

government asserts the purse's search was permissible under this exception.   (Filing No. 46 at p. 15).   Although these facts cited by the government certainly gave probable cause to arrest Defendant inside the casino, such facts do not establish probable cause to search Defendant's car.

In this case, Defendant dropped two dime bags from her pocket consistent with personal use upon entering the casino.  On this issue, the undersigned magistrate judge finds Officer Blevins' testimony is credible, and Officer Mousseau's testimony is not.  Officer Blevins testified the two baggies were about the size of a dime bag, and were "[o]ne of the real small ones," estimating their measurements to be about three-quarters of an inch wide by about three-quarters of an inch tall.  Officer Blevins testified a dime bag is generally known as a user amount.  (TR1 at 136).  Officer Blevins' body camera captured the two baggies as he was handing them to Officer Mousseau for evidence collection.  (Ex. 4 at 10:30).  The size of the two baggies is consistent with Officer Blevins' testimony and his assessment that they were dime bags associated with personal use.  In contrast, Officer Mousseau testified there seemed to be "a lot" of the crystal substance contained in the baggies, but could give no estimate on the baggies' size or dimensions. The undersigned magistrate judge therefore gives no weight to Officer Mousseau's testimony that it was "a lot" of suspected methamphetamine.

This was not a traffic stop.  As such, law enforcement officers were presented with none of the usual factors that typically give rise to probable cause to believe a vehicle contains evidence of a drug crime, such as conflicting stories from the vehicle's occupants about their destination, odor of narcotics emanating from inside the vehicle, or a positive indication from a drug canine.  There was also no evidence that officers were familiar with Defendant or had any information that drug activity was taking place in the casino's parking lot, or that Defendant was involved in drug trafficking activity.  Instead, the record only establishes Defendant parked her car in a casino parking lot and entered the business as patron with her boyfriend and her mother, neither of whom were arrested after officers took their information and searched them.  There is also no indication Defendant ever returned to her car after arriving at the casino.  She appeared to be a regular patron of the casino and was playing at a machine on the casino floor when she was initially approached by law enforcement.  See, e.g., *United States v. Perez-Trevino*, 891 F.3d 359, 367 (8th Cir. 2018)(automobile exception applied to the search of a cooler inside a vehicle, where, during a traffic stop, the vehicle's occupants provided contradictory statements about their destination, and where the officer had smelled marijuana and recovered marijuana and dollar bill

containing drug residue during his search of the car); *United States v. Mayfield*, 678 F. App'x 437, 439 (8th Cir. 2017)(odor of marijuana emanating from vehicle provides probable cause to search the vehicle pursuant to the automobile exception); *United States v. Daniel*, 809 F.3d 447, 449 (8th Cir. 2016)(probable cause arose where police observed the defendant "engage in behavior consistent with a hand-to-hand drug transaction from inside the suspect vehicle," and where officers recovered a baggie of drugs the defendant discarded outside the vehicle and smelled an odor of marijuana emanating from the vehicle); *United States v. Webster*, 625 F.3d 439, 445 (8th Cir. 2010)(probable cause existed to search vehicle where the defendant had arrived at a store's parking lot at the same time set for a controlled drug buy; the defendant had completed two controlled buys with an informant within the previous month; the defendant had spoke with the informant in the vehicle before the informant gave a visual signal to officers indicating the defendant had drugs in his possession; the defendant had attempted to flee police by ramming a police car; and when drugs were found on the defendant's person when he was arrested); *United States v. Davis*, 569 F.3d 813, 815 (8th Cir. 2009)(probable cause existed to search vehicle during traffic stop where officer smelled the odor of marijuana emanating from the vehicle and found marijuana on the defendant's person during a pat down search conducted after the officer asked the defendant to step out of the vehicle); *United States v. Blaylock*, 535 F.3d 922, 927 (8th Cir. 2008)(probable cause supported search of the defendant's car parked next to his house when an undercover investigation had revealed a pattern of drug dealing involving the use of that vehicle). Each of the above cases demonstrates that there must be some nexus between the vehicle to be searched and the suspected drug activity. See *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)("[T]here must be evidence of a nexus between the contraband and the place to be searched[.]"). That was not the case here.

The record contains some contradictory testimony by Officer Mousseau regarding why he first opened Defendant's car to search her purse; he testified that "[t]he sole purpose of going to the car and obtaining the money out of the purse was based on [Defendant's] request" and that at the time he first headed to Defendant's car, he did not have "any reason to believe that there were any items of evidentiary value in that car;" however, he also testified he believed there could be "some type of ledger or anything associated with selling methamphetamine . . . present in the vehicle." But, regardless of Officer Mousseau's subjective motivations for conducting the search, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's

state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006)(quoting *Scott v. United States*, 436 U.S. 128, 138 (1978))(emphasis in original).  In this case, officers' recovery of a personal use amount of suspected methamphetamine and two pipes inside the casino, without anything more, does not objectively give rise to probable cause justifying the search of Defendant's car.  Considering the totality of the circumstances, the undersigned magistrate judge finds probable cause did not exist justifying the search of Defendant's car and the containers located therein, including her purse. Therefore, the government has not met its burden to establish that the automobile exception to the warrant requirement applies.

### C. Inventory Search

Finally, the government asserts the items recovered from Defendant's purse and car were obtained pursuant to a valid inventory search.  "It is 'well-settled' law that 'a police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to secure and protect vehicles and their contents within police custody.'" *United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015)(quoting *United States v. Rehkop*, 96 F.3d 301, 305 (8th Cir. 1996)).  An inventory search "must comply with 'standardized police procedures.'" *Id.* at 1016 (quoting *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998)).  "The Government bears the burden of showing that its conduct complied with the inventory search exception to the warrant requirement." *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011)(citing *United States v. Marshall*, 986 F.2d 1171, 1173 (8th Cir. 1993)).  "In the context of an inventory search this burden requires the government to produce evidence that impoundment and inventory search procedures were in place and that law enforcement complied with those procedures." *United States v. Kennedy*, 427 F.3d 1136, 1144 (8th Cir. 2005)(citing *Marshall*, 986 F.2d at 1174).  "The inventory search exception is necessary for 'the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger.'" *Taylor*, 636 F.3d at 464 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).

In this case, the government produced evidence that the Santee Sioux Police Department had a written inventory search procedure in place on July 14, 2019.  (Ex. 13).  However, both Officer Mousseau and Officer Blevins testified they were not aware of the policy. And, their

actions did not comply with the policy that was in place.  The policy provided that, "[o]n any arrests involving vehicles," officers were to use the criteria of location, time of day, and area to determine whether or not to impound the vehicle.  The officer may also impound a vehicle "[i]f the Officer feels the vehicle will not be safe at its present location." Impounded vehicles were to be "towed to the nearest available storage facility" and, "[u]pon reaching the storage facility, a complete inventory will be made of the contents of the car."  The written policy further provided that "A copy of the inventory list will be left with the owner of [sic] operator of the vehicle and a copy will be placed in the arrest report."  Neither officer testified Defendant's vehicle was unsafe at its location in the casino parking lot.  And, although Officer Blevins may have filled out some sort of inventory list, a copy was not provided to Defendant, nor could officers locate a copy of the inventory list at the time of the evidentiary hearing.

Officers may use some discretion in conducting inventory searches "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *United States v. Hall*, 497 F.3d 846, 851 (8th Cir. 2007)(quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)); see also *United States v. Evans*, 781 F.3d 433, 436 (8th Cir. 2015).  "So long as the officer's residual judgment is exercised based on legitimate concerns related to the purposes of an impoundment, his decision to impound a particular vehicle does not run afoul of the Constitution." *Id.* (quoting *United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004)).  An inventory search must be "reasonable under the totality of the circumstances . . . and may not be "a ruse for a general rummaging in order to discover incriminating evidence." *Id.* (internal citations omitted).  "Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search." *Taylor*, 636 F.3d at 465.  "[S]omething else" must be present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle." *Id.*  In *Taylor*, the "something else" was the officer's' testimony that "the basis for traffic stop, the arrest, the towing of the vehicle, and the inventory search was the officer's belief that [the defendant] had narcotics in his vehicle" and that the officer "would not have arrested [the defendant], impounded his vehicle, or inventoried the contents of the truck if not for her belief that the vehicle contained evidence of a narcotics crime." *Id.*  The Eighth Circuit found such testimony established that the inventory was "merely a pretext

for an investigatory search" and that therefore the inventory search exception to the Fourth Amendment warrant requirement did not apply. *Id.*

In this case, Officer Mousseau testified he decided to do an inventory search of Defendant's car "[b]ased on what we found up to that point," meaning, what he had found in Defendant's purse inside the car's trunk. Officer Mousseau testified that before he found the contraband inside Defendant's purse, he had no reason to impound Defendant's vehicle. (TR1 at 84). Officer Mousseau testified Defendant's car would have been towed "regardless because of the incident that had occurred" as the casino has a "zero tolerance policy for drugs . . . If [an individual] can't remove [his or her] vehicle because [he or she is] arrested, then it's towed and impounded." (TR1 at 34). However, until she was arrested, Defendant's car was lawfully parked in the well-lit parking lot of the casino. It was not a roadside hazard, did not impede traffic, nor did it threaten public safety. See *United States v. Harris*, 795 F.3d 820, 822 (8th Cir. 2015)("Under a community caretaking function, the authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.")(internal quotation marks and citation omitted). Officer Mousseau testified the casino would not have permitted Defendant's car to remain parked on its property after Defendant's arrest. But, this was not a situation where Defendant's car would have sat unattended for any period of time after Defendant's arrest. Defendant's boyfriend and mother were both present at the time Defendant was arrested. Both had driver's licenses, did not appear to be under the influence of any substances, were not detained or arrested, had arrived at the casino in the same car, and were capable of driving the vehicle away at that time. In fact, Defendant's boyfriend already had the car keys in his possession—he only turned them over at Officer Mousseau's direction. *Cf. United States v. Frasher*, 632 F.3d 450, 454 (8th Cir. 2011)(finding inventory search was permissible where "vehicle was parked in a restaurant parking lot, and there was no responsible person able to take immediate custody of the vehicle"); *United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011)(finding inventory search was reasonable where officer substantially complied with the written inventory search policy requiring an officer not to leave an arrestee's vehicle unattended and "[n]o one was available after [the defendant's] arrest to take custody of the vehicle"). The traditional factors supporting officers' community caretaking function were not present in this case. Instead, as Officer Mousseau testified, the only reason he decided to conduct an inventory search was because of the incriminating evidence he had found during his

warrantless search of Defendant's purse inside the car, which as discussed above, was performed without probable cause.  As such, the undersigned magistrate judge finds that the warrantless search of Defendant's vehicle cannot be upheld as a valid inventory search.

In conclusion, because officers' actions inside the casino were reasonable under the Fourth Amendment, any evidence obtained by officers inside the casino does not need to be suppressed. However, any evidence obtained pursuant to the warrantless search of Defendant's purse and car should be suppressed as the government did not meet its burden to establish that one of the exceptions to the warrant requirement applies.

Upon consideration,

**IT IS HEREBY RECOMMENDED** to United States District Court Brian C. Buescher that Defendant's Motion to Suppress (Filing No. 41) be granted, in part, and in part denied as set forth above.

Dated this 1st day of March, 2021.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection.  The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.